COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
Peter S. Pearlman
Matthew F. Gately
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
(201) 845-9600 (telephone)
(201) 845-9423 (fax)
mfg@njlawfirm.com

*(Additional Counsel on Signature Page)*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| COSTANTINO ZANFARDINO, Derivatively on Behalf of Nominal Defendant ZERIFY, INC., formerly known as STRIKEFORCE TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> MARK L. KAY, ROMARAO PEMMARAJU AND GEORGE WALLER, <br><br> Defendants, <br><br> And, <br><br> ZERIFY, INC., formerly known as STRIKEFORCE TECHNOLOGIES, INC. <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff, Costantino Zanfardino ("Plaintiff"), residing at 2037 Samoa Court, Vista, California 92081, by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Zerify, Inc., formerly known as Strikeforce Technologies, Inc. ("Strikeforce" or the "Company") against the Defendants (defined below), who are the sole members of the Company's Board of Directors (the "Board") for breaches of fiduciary duties, corporate waste, and unjust enrichment.  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action seeking to remedy wrongdoing committed by the Defendants, the Company's directors, in their management of the Company.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and Plaintiff and all the Defendants are citizens of different states.

3.      This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

4.      Venue is proper in this judicial district because the alleged wrongs complained of occurred in this district, the Defendants have conducted business in this district, and the Defendants' actions have had an effect in this district.

## PARTIES

### Plaintiff

5.      Plaintiff, a resident of the State of California, purchased shares of the Company's stock in March 2017, and has held the Company's stock continuously since that time.

### Nominal Defendant

6.      The Company is incorporated in Wyoming and its principal place of business is located at 1090 King George Post Road, Edison, NJ 08837. The Company's common stock trades on the OTC ticker symbol "ZRFY". Prior to August 11, 2022, the Company traded under the symbol "SFOR".

### Defendants

7.      Defendant Mark L. Kay ("Kay") is the CEO and Chairman of the Board. He resides at 233 Excalibur Drive Newtown Square, PA 19073.

8.      Defendant Ramarao Pemmaraju ("Pemmaraju") is a Co-Founder of the Company and its Chief Technology Officer, Corporate Secretary, and a member of the Board.  He resides at resides at 8 Ponderosa Lane, Old Bridge, NJ 08857.

9.      Defendant George Waller ("Waller") is a Co-Founder of the Company and its Executive Vice President and Head of Marketing, and a member of the Board. Waller resides at resides at 83 Crowell Avenue. Staten Island, NY 10314.

10.     Kay, Pemmaraju, and Waller (collectively, the "Defendants") are the only members of the Board.

## BACKGROUND

11.     The Company describes itself as a software development and services company.

12.     The Company was incorporated in August 2001 pursuant to the laws of the State of New Jersey under the name Strikeforce Technical Services Corporation.

13.     On September 3, 2004, the Company changed its name to Strikeforce Technologies, Inc.

14.     The Company has incurred substantial losses since its inception.

15.     On November 15, 2010, the Company, at the direction of the Defendants, redomiciled under the laws of the State of Wyoming and created Preferred Series A shares with voting control rights over the Company ("Preferred A").

16.     No Preferred A was issued at that time.

17.     Then, in February 2011, the Defendants issued themselves one preferred Series A share each, the consideration for which was nothing or a minimal amount, which gave them 80% voting control of the Company.

18.     The issuance of the Series A shares to the Defendants set the stage for them to create a number of reverse splits, which allowed them to report to the shareholders that 80% of the shareholders voted to approve those splits.

19.     After —and in connection with—a number of these reverse splits, the Defendants issued themselves new shares as salary or other compensation to avoid any dilution of their ownership interest.

20.     In fact, there was no legitimate business justification for the issuance of those additional shares by the Defendants to themselves in the amounts issued.

21.     Rather, the purpose was to enable the Defendants to gain and retain control of the Company to continue to engage in a number of self-dealing transactions for their own benefit and to the detriment of the Company.

22.     For example:

      (a)     In 2014, the Defendants engineered a reverse split whereby 1500

common shares were converted to one common share;

(b)     In 2015, the Defendants engineered a reverse split whereby 650 common shares were converted to one common share;

(c)     Later in 2015, the Defendants engineered a reverse split whereby 1000 common shares were converted to one common share; and

(d)     In 2020, the Defendants engineered a reverse split whereby 500 common shares were converted to one common share.

23.     There was no legitimate business justification for these reverse splits.  The purpose for the reverse splits was to enable the Defendants to engage in a number of self-dealing transactions for their own benefit and to the detriment of the Company, as described below.

24.     In February 2021, the Company issued 17,208,335 shares of common stock to three employees upon the cashless exercise of options. One of the employees, Pemmaraju, received 9,833,334 shares of stock.

25.     The purpose of this transaction was to allow Pemmaraju to enrich himself to the detriment of the Company.

26.     For 2021, the Company had revenue slightly above $200,000, and losses in excess of $10 million.

27.     In March 2021, the Company issued 16,931,437 shares of common stock, to Auctus Fund LLC ("Auctus") for financing services rendered, related to notes payable, and cancellation of warrants to purchase 50,000 shares of common stock that was granted in fiscal 2020.

28.     In the Second Quarter of 2021, the Company issued 45,569,000 shares of common stock, with a value of over $6 million, to Auctus for financing services relating to raising $5 million.

29.     The $6 million fee, more than the amount raised, was exorbitant and

damaged the Company.

30.    The Company used $1 million of the proceeds from the Auctus financing to acquire a 69% interest in BlockSafe Technologies, Inc. ("BlockSafe") and a 39% interest in BlockSafe for the Defendants.

31.    The Defendants then engineered an agreement with BlockSafe (which they and the Company controlled) to secure for the Defendants:

      (a)    a $36,000 per month "management fee"; and

      (b)    a $5 million fee payable over 5 years.

32.    The benefits to the Defendants described in the previous paragraph were obtained by using the Company's funds.

33.    In June 2020, the Defendants caused the Company to execute a 1:500 reverse stock split.

34.    In December 2020, the Defendants took 57,000,000 warrants for the Company's shares.

35.    In December 2021, Defendants took 65,000,000 warrants for the Company's shares.

36.    Thus, in one year, Defendants took 122,000,000 warrants for the Company's shares.

37.    Along with harming the Company by setting the stage for additional stock compensation, the Defendants had the ability to adjust the strike price at any time due to their holding of the three Preferred A shares that gave them control of 80% of the Company.

38.    In July 2021, the Company issued 13,557,693 shares of common stock to three employees upon the cashless exercise of options.

39.    Upon information and belief, those employees included one or more of

the Defendants.

40.     Issuing these shares when the Company was in dire financial condition caused harm to the Company.

41.     In September 2021, the Company issued 9,189,627 shares of common stock to Waller upon the cashless exercise of options.

42.     Issuing these shares to Waller when the Company was in dire financial condition caused harm to the Company.

## DEMAND ON THE BOARD

43.     Pursuant the Wyoming Business Act, Wyo. Stat. Ann. § 17-16-742, and the relevant New Jersey statute, N.J. Stat. Ann. § 14A:3-6.3 (West), Plaintiff demanded that Defendants investigate Plaintiff's claims of corporate wrongdoing.

44.     On June 10, 2022, Plaintiff made a demand in writing to the Defendants pursuant to Wyo. Stat. Ann. § 17-16-143 (2022), a copy of which is annexed as Exhibit 1 (the "Demand Letter") and incorporated by reference.

45.     When no response was forthcoming, on August 15, 2022, Plaintiff's counsel wrote to Kay by email inquiring as to the status of the response to the Demand Letter.   A copy of this email, and the email referenced in the next paragraph, are attached as Exhibit 2.

46.     Later, on August 15, 2022, Kay responded by email stating, "Robert, sorry, I will be talking to my lawyers with your answer…. Thanks Mark" (ellipses in the original).

47.     Four days later, on August 19, 2022, the Company's counsel wrote to Plaintiff's counsel, a copy of which is attached as Exhibit 3 (the "Response"). The Response concluded that Plaintiff's inquiries "are now satisfied and that this matter is closed."

48.    Thus, the Defendants rejected the investigation sought by the Demand Letter.

49.    Plaintiff has satisfied the prerequisites for filing this lawsuit.

## THE DEFENDANTS' RESPONSE

50.    Request number 1 of the Demand Letter stated, "During the three months ended March 31, 2021, the Directors caused the issuance of 16,168,589 common shares with fair value of $1,035,000 to settle a $45,000 debt... Who received those shares?"

51.    The Response stated, "These shares of common stock were issued to convertible note holder, Crown Bridge Partners LLC upon the conversion of its $20,000 convertible note in January 2021 and its $25,000 convertible note in March 2021. See 10-K/A for the fiscal year ended December 31, 2021, at Part II, Item 5(D)."

52.    The original option strike price should have been adjusted post the 1:500 reverse split, which occurred on June 25, 2020, to a strike price that also reflected the reverse split.  It was not.

53.    In March of 2021, the Company's stock price traded in the $.14 - $.19 range.  The issuance of 16,168,589 shares to Crown Bridge Partners LLC ("Crown Bridge") for $1,035,000 was a gross overpayment to Crown Bridge. Those shares trading in the range of $.14-$.19 would be valued between $2.6 and $3.07 million.

54.    The Company, and other small cap entities, massively over-paying Crown Bridge with stock did not go unnoticed by the SEC.

55.    On August 2, 2022, **before** the Company sent the Response, Crown Bridge had agreed to a judgment in favor of the SEC.

56.    In *Securities and Exchange Commission v. Crown Bridge Partners LLC*, 1:22-cv-6537 (SDNY) (the "SEC Action"), Crown Bridge agreed not to engage in

further violations Section 15(a)(1) of the Securities Exchange Act of 1934.

57.    The complaint in the SEC Action (the "SEC Complaint") alleged, among other things, that Crown Bridge Partners:

> Crown Bridge, acting through and under the control to Soheil and Sepas, acquired billons of unrestricted, newly issued shares of common stock through the conversion of convertible notes in entered into with various issuers. During the period in which Crown Bridge acquired and held such shares, the shares did not meet any of the exceptions to the definition of "penny stock," as set forth in Exchange Act Section 3(a)(51) and Exchange Act Rule 3a51-1. [*See* 15 U.S.C. § 78c (a)(51); 17 C.F.R. § 240.3a51–1]. Defendants therefore participated in the offering of penny stocks in connection with the actions undertaken to operate Crown Bridge's convertible notes business.

SEC Complaint ¶ 44. The SEC Complaint and the Judgment are attached as Exhibits 4 and 5.

58.    The Company should seek to hold the Defendants accountable for the wrongful issuance of the shares to Crown Bridge for the conversion of Crown Bridge's $20,000 convertible note in January 2021, and its $25,000 convertible note in March 2021.

59.    Request number 2 of the Demand Letter stated, "In February 2021 the Directors caused the modification of 12,250,000 unvested warrants to be vested with a value of $3,675,000. See Company's 2021 Form 10-K, p. 36, paragraph 4. Who held those warrants?"

60.    The Response stated, "In February 2021, the Company issued 17,208,335 shares of common stock to three employees upon the cashless exercise of options. One of the employees, Ramarao Pemmaraju, is a member of the Company's management team and he received 9,833,334 shares of stock. In February 2021, 12,250,000

unvested options granted in fiscal 2020 were modified and such options became fully vested. Pursuant to current accounting guidelines, the Company measured the fair value of these options and determined their fair value to be $3,675,000, which was recorded as stock compensation expense. The portion of the remeasured fair value of the options which was expensed and attributed to Ramarao Pemmaraju was $2,100,000. See 10-K/A for the fiscal year ended December 31, 2021, at Part II, Item 5(D)."

61.     While one of the warrant holders, Pemmaraju, was disclosed in a subsequent 10-K/A filing to be an executive in a Company with nine employees, the other two warrant holders were not mentioned in the Response.

62.     Given the dire financial condition of the Company, compensating Pemmaraju with over $2 million of stock was a breach of the Defendants' fiduciary duties to the Company and damaged the Company.

63.     The Company should demand the return of the excessive compensation, particularly since it was issued at a time when the Company had losses in 2020 of $10,088,000 and revenues of a mere $207,000, making Pemmaraju's excessive compensation almost 18 times greater than the Company's revenue.

64.     Request Number 3 of the Demand Letter stated, "In March 2021 the Directors caused the issuance of 16,931,437 shares with fair value of $3,239,000 for the cancellation of warrants to purchase 50,000 shares of common stock. See Company's Form 10- Q for the first quarter of 2021, p. 17. Who received those shares?"

65.     The Response stated, "These shares of common stock were issued to Auctus Fund LLC. See 10-K/A for the fiscal year ended December 31, 2021, at Part II, Item 5(D)."

66.     The Defendants should be accountable for issuing shares to Auctus

without accounting for the reverse splits.

67.     In March 2021, the Company's shares were trading in a range of $.14 - $.19.  Issuing shares to Auctus at a fraction of the March 2021 trading price, to cancel an option to buy 50,000 common shares, was a waste of the Company's assets, particularly, as alleged above in paragraphs 27 through 32, since the Defendants used $1 million of the proceeds to obtain 31% of BlockSafe and lucrative management contracts.

68.     Request Number 4 of the Demand Letter stated "The Company's Form 10-Q for the first quarter of 2021, shows SG&A [Selling, General, and Administrative Expenses] increased by more than $5 million for that quarter. See Form 10-Q for the first quarter of 2021, p. 4. For prior years, SG&A averaged about $500,000 a quarter. What line items of SG&A caused that increase?"

69.     The Response stated, "The increase in SG&A in 2021 was due primarily to an increase in employee stock based compensation and professional fees. See 10-K/A for the fiscal year ended December 31, 2021, Item 7."

70.     It was disclosed in a subsequent 10-K/A filing that the increase in SG&A was for employee compensation.

71.     The Company had nine employees with revenues in 2020 of $207,000 and losses of $10,088,000 and in 2021 revenues of $193,000 and losses of $17,245,000.

72.     The Company should seek the return of the excessive compensation taken by the Defendants, while the Company had minimal revenue and massive losses.

73.     Request Number 5 of the Demand Letter stated, "The Company granted 45,569,000 shares to a financing entity as part of a financing transaction. The shares were valued at $6,569,000, expensed, and recorded as a finance cost. See Company is Form 10- Q for the second quarter of 2021, p. 18. Who received the shares? Why and

how much money was raised."

74.    The Response stated "45,150,500 shares of common stock were received by Auctus Fund LLC for cashless exercise of warrants held by Auctus for financing services rendered, related to notes payable, and cancellation of warrants. See 10-K/A for the fiscal year ended December 31, 2021, at Part II, Item 5(D) and Notes to Consolidated Financial Statements, p. F-16."

75.    The Company should demand that the Defendants be held liable for issuing $6,569,000 of stock for financing services rendered.

76.    The Company raised less than $5 million and it is an abdication of the Defendants' duties as directors to pay such a large fee in connection to with raising a relatively small amount of money, particularly when the Defendants used $1 million of the proceeds to benefit themselves.  See paragraphs 27-32, above.

77.    Request Number 6 of the Demand Letter stated, "During the period ending September 30, 2021, the Company separately issued (i) 17,208,335, (ii) 12,349,726, (iii) 13,557,335, and (iv) 9,189,627 common shares. See Company's 2021 Form 10-K, p. 36, paragraphs 4 and 5; Company's 10- Q for the second quarter of 2021, p.18. Why were these shares issued? Who received those shares?"

78.    The Response stated, "The issuance of 17,208,335 shares of common stock was to three employees, including one member of the Company's management team, upon the cashless exercise of stock options. See 10-K/A for the fiscal year ended December 31, 2021, at Part II, Item 5(D). The issuance of 12,349,726 shares of common stock was to Auctus Fund LLC for financing services rendered, related to notes payable, and cancellation of warrants. See 10-K/A for the fiscal year ended December 31, 2021, at Part II, Item 5(D). The issuance of 13,557,693 shares of common stock was to three employees upon the cashless exercise of stock options. See 10-K/A for the fiscal year ended December 31, 2021, at Part II, Item 5(D). The

issuance of 9,189,627 shares of common stock was to George Waller, a member of the Company's management team, upon the cashless exercise of stock options. See 10-K/A for the fiscal year ended December 31, 2021, at Part II, Item 5(D)."

79.    The Company should seek that Defendants be held accountable for the issuing of 39,955,655 shares issued as follows:  17,208,335 that included Waller, 13,557,693 shares issued to three employees, and 9,189,627 shares issued to Waller.

80.    In 2021, the Company had revenues of $193,000 and losses of $17,245,000.

81.    The Defendants causing the issuance of shares as set forth in Paragraph 79 was an abdication of the Defendants' duties as directors breach of their fiduciary duties owed the Company and damaged the Company.

82.    Request Number 7 of the Demand Letter stated, "As set forth in the Company's Form 10-K for the year ended December 31, 2021 and filed with the SEC (the "2021 10K") BlockSafe Technologies, Inc. ("BlockSafe") was formed on December 1, 2017, in the State of Wyoming. BlockSafe is in the business of providing total cyber security solutions and is a licensee of StrikeForce for its desktop anti-malware product called "GuardedID®", which the Company claimed was a 'one of a kind mobile application.' During the first quarter of 2021, the Directors issued to themselves 31% of BlockSafe. The Board should investigate whether Defendants abdicated their duties as directors and instead lined their own pockets in this transaction.

83.    The Response stated, "The Company reviewed this transaction and found no evidence of any wrongdoing. Moreover, the Company fully disclosed information related to BlockSafe. See 10-K/A for the fiscal year ended December 31, 2021, p. 12-13, Note 1 to the Financial Statements at F-7, Note 7 to the Financial Statements at F[1]13, Item 13 at pp. 40-41, and Exhibits 10.10, 10.11, and 10.12."

84.    The Defendants' control 80% of the voting rights of the Company and took advantage of this to obtain a 31% ownership in BlockSafe, paid for by the Company.  See Paragraphs 27-32, above.

85.    The Defendants' causing the Company to issue 31% of BlockSafe to themselves was an abdication of the Defendants' duties as directors breach of their fiduciary duty, and the Company's failure to take action with respect to it—at the Defendants' insistence, was as well.

86.    The Company should hold the Defendants accountable and seek the return to the Company of the Defendants' 31% ownership in BlockSafe.

87.    Request Number 9 of the Demand Letter stated, "the 2021 10-K at page 36, paragraph 4, states that the shares and options the Director defendants took for themselves cost the Company $3,675,000 and $2,172,000 equaling $5,847,000. While the Company had to take this as an expense in its SEC filings, no W-2's or 1099's were issued to the Directors. Why was this compensation not disclosed to shareholders? Did this impact SG&A for the first quarter of 2021 of over $5,000,000?"

88.    The Response stated, "These cashless exercises of stock options were disclosed. See 10-K/A for fiscal year ended December 31, 2021, Part II, Item 5(D), Note 13 to the Financial Statements at p. F-17.  "As for the impact on SG&A, please see response to Request No. 4 above."

89.    The Response did not address the failure to issue W-2 or 1099 IRS forms.

90.    The Defendants' actions relating to the shares and options issued to themselves is an abdication of their duties as directors, which damaged the Company.

91.    The Company should seek recovery from the Defendants of so much of the excessive compensation paid to or for the benefit of themselves while the Company had minimal revenue and massive losses.

92.    The Company concluded its Response by issuing the conclusory—and

incorrect—statement "Because neither the Company, nor any of its officers or directors has engaged in any wrongdoing in connection with any of the transactions noted in your letter, no further action is warranted, and the Company hereby rejects any suggestion by Mr. Zanfardino that the Company take any further action. Furthermore, because of the disclosures made by the Company in its SEC filings, including its 10-K/A for the fiscal year ended December 31, 2021, we trust that Mr. Zanfardino's inquiries are now satisfied and that this matter is closed. Should you have any questions, please do not hesitate to contact me at (212) 885-5345."

## DUTIES OF THE DEFENDANTS

93.    Because of their positions as directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Defendants owed the Company and its shareholders—when discharging their duties as directors—a duty to act in good faith and in a manner not opposed to the Company and in the Company's best interest.

94.    These obligations required the Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.

95.    The Defendants were also required to act in furtherance of the best interests of the Company and its shareholders.

96.    Further, each Defendant owes to the Company and its shareholders the duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company, and in the use and preservation of its property and assets.

97.    As directors of the Company, the Defendants must discharge their duties with the care that a person in a like position would reasonably believe appropriate under similar circumstances.

98.    By virtue of such duties, the directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company to avoid wasting the Company's assets, and to maximize the value of the Company's stock and not benefit themselves at the expense of the Company;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(d)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, and rules and regulations; and

(e)     ensure that all decisions were the product of independent business judgment and not the result of outside influences, entrenchment motives and not benefit themselves at the expense of the Company.

99.     Each Defendant, by virtue of his position as a director, owed to the Company the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

100.    None of the three Defendants—the sole directors of the Company—was at the time of the transactions complained of herein, or at the time the Company purported to consider the Demand Letter, a qualified director of the Company, as that term is defined under Wyo. Stat. Ann. § 17-16-143.

101.    The conduct of the Defendants complained of herein involves a knowing

and culpable violation of their obligations as directors of the Company. The Defendants did not, in good faith, act in the best interests of the Company, and acted with a disregard for their duties to the Company and its shareholders.

## DAMAGES TO THE COMPANY

102.   As a direct and proximate result of the Defendants' misconduct, the Company has lost, and will continue to lose and expend, many millions of dollars.

103.   These expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Defendants who abdicated their duties as directors, which damaged the Company.

104.   As a direct and proximate result of the Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

105.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered, and to be suffered, as a direct and proximate result of the abdication of the Defendants' duties as directors, which damaged the Company.

106.   Plaintiff will fairly and adequately represent the interests of the Company in enforcing the rights of the Company

107.   Plaintiff has retained counsel competent and experienced in derivative litigation.

108.   The Company rejected the request for an investigation as set forth in the Demand Letter.

109.   Each Defendant approved and/or permitted the wrongs alleged herein to have occurred and participated therein for their own pecuniary benefit to the detriment of the Company.

## COUNT I

### (Against Defendants For Breach Of Fiduciary Duty)

110.   Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

111.   The Defendants owed the Company a duty to discharge their duties as directors in good faith and in a manner in the best interests of Company.

112.   Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

113.   Defendants violated and breached their duties.

114.   Defendants' actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

115.   As a direct and proximate result of the Defendants' failure to perform their obligations, the Company has sustained and will continue to sustain significant damages.

116.   Because of the misconduct alleged herein, the Defendants are liable to the Company.

117.   As a direct and proximate result of the Defendants' breach of their duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.

## COUNT II

### (Against the Defendants For Waste Of Corporate Assets)

118.   Plaintiff incorporates by reference and realleges each allegation contained

above, as though fully set forth herein.

119.   As a result of the misconduct described above, the Defendants wasted corporate assets by, *inter alia*, paying excessive compensation to themselves.

120.   Because of the waste of corporate assets, Defendants are liable to the Company.

## COUNT III

### (Against Defendants For Unjust Enrichment)

121.   Plaintiff incorporates by reference and realleges each allegation set forth above, as though fully set forth herein.

122.   The Company gave the Defendants $1 million from the Auctus transaction described above in paragraphs 27-32.

123.   The $1 million described in the preceding paragraph was in addition to the excessive compensation described above.

124.   The consideration described in paragraphs 122 and 123, were accepted, enjoyed and used by the Defendants.

125.   The Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company, received compensation, or other payments that were unjust in light of Defendants' bad faith conduct.

126.   Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of their duties;

B.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein;

C.      Awarding to the Company damages;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 13, 2022

Respectfully Submitted,

*/s/ Matthew F. Gately*
Peter S. Pearlman
Matthew F. Gately
COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
Park 80 Plaza West-One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663

(201) 845-9600
psp@njlawfirm.com
mfg@njlawfirm.com

Robert Schachter, Esq. (pro hac vice
admission forthcoming)
Jessica Hermes, Esq. (pro hac vice
forthcoming)

Zwerling, Schachter & Zwerling, LLP
41 Madison Avenue
(212)223-3900
rschachter@zsz.com
jhermes@zsz.com

**VERIFICATION**

I, Costantino Zanfardino, declare that I have reviewed the Verified Stockholder Derivative Complaint (the "Complaint") prepared on behalf of Zerify, Inc. ("Zerify"), and I authorize its filing. I have reviewed the allegations made in the Complaint and those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder and have been a continuous holder of Zerify stock during the relevant period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

December 13, 2022

_____
CONSTANTINO ZANDARFINO